14 So.2d 368

## TENNESSEE VALLEY BANK v. WILLIAMS.

### 7 Div. 746.

Supreme Court of Alabama.

June 24, 1943.

S. A. Lynne, of Decatur, for appellant.

A. E. Hawkins, and Scott & Dawson, all of Fort Payne, and Brown & Conway, of Albertville, for appellee.

GARDNER, Chief Justice.

The suit is on a negotiable promissory note by an indorsee against the maker. The meritorious question in the case is whether the plaintiff is a holder in due course. Undisputedly the note was signed by the defendant, negotiated and indorsed by the payee before maturity upon payment of the full face value with interest to date of indorsement. The defense is rested upon the theory of misrepresentations made to him by the president of the payee bank, and defendant's proof suffices to establish such fraud as to constitute a defense as between the payee and the maker. But the note being negotiated for value before maturity, the burden was on the defendant to prove notice of the fraud. "Every holder is deemed prima facie to be a holder in due course." Title 39, § 61, Code of 1940. Reliance Equipment Co. v. Sherman, 216 Ala. 214, 112 So. 822. Upon conclusion of the evidence the plaintiff requested the affirmative charge, which was refused, and this presents the pivotal question in the case.

In keeping with the provisions of our statute, Title 39, § 58, Code of 1940, our authorities are to the effect that to constitute notice of an infirmity in a negotiable instrument, the indorsee must have knowledge of such facts that his action in taking the instrument amounted to bad faith. Bad faith

470

in the purchase, or such gross negligence as is evidence of bad faith, must be shown. Snell National Bank v. Janney, 219 Ala. 396, 122 So. 362. And in Sample v. Tennessee Valley Bank, 200 Ala. 578, 76 So. 936, 937, is the expression, "Nothing short of bad faith would have destroyed plaintiff's standing as a bona fide purchaser."

And our decisions are in harmony with the current of authority elsewhere that circumstances which might merely arouse suspicion are not enough to justify an inference of bad faith. Spires v. Jones, 212 Ala. 117, 101 So. 753; Spence v. Mobile & Montgomery Ry. Co., 79 Ala. 576. And as observed by the Iowa court in Hess v. Iowa Bankers' Mortgage Co., 198 Iowa 1365, 201 N.W. 91, 92:

"The cases are uniform in their holding that mere negligence, knowledge of suspicious facts and circumstances, or failure to inquire into the consideration is insufficient to charge a holder of negotiable paper with bad faith in its procurement. * * * If, however, the holder had actual knowledge of suspicious circumstances, coupled with the means of readily informing himself of the facts, and he willfully abstains from making inquiries, his intentional ignorance may amount to bad faith. * * * Actual knowledge of just what facts and circumstances will render the purchase of a negotiable instrument an act of bad faith is difficult of precise designation. The term 'bad faith,' as used in the statute, is the direct opposite to 'good faith,' and means actual knowledge of such facts and circumstances as would charge a reasonably prudent business man with bad faith and dishonest motives in purchasing the paper."

Like thought is expressed by the United States Supreme Court in King v. Doane, 139 U.S. 166, 11 S.Ct. 465, 467, 35 L.Ed. 84, where the court observed that it must be proved "that he purchased with actual notice of defect in the title, or in bad faith, implying guilty knowledge or willful ignorance." And in Drew v. Wheelihan, 75 Minn. 68, 77 N.W. 558, 559, it is stated that "the rule may be said to resolve itself into a question of honesty or dishonesty, for guilty knowledge and willful ignorance alike invoke the result of bad faith." Like expressions are to be found in Forbes v. First National Bank, 21 Okl. 206, 95 P. 785. See also Gigoux v. Moore, 105 Kan. 361, 184 P. 637, and Goodman v. Simonds, 20 How. 343, 61 U.S. 343, 15 L.Ed. 934; Vol. II, Joyce's Defenses to Commercial Paper, § 694.

In view of the legal principles above stated, the instant case reduces itself to the simple inquiry as to whether or not the officers of plaintiff bank had knowledge of such facts or circumstances as made·the purchase of this note an act of bad faith. If no such reasonable inference could be drawn from the evidence, the affirmative charge was due to be given the plaintiff as requested. Reliance Equipment Co. v. Sherman, supra; Forbes v. First National Bank, supra.

A brief reference to the facts is necessary. One Irvin was the president of the First National Bank of Albertville on the 12th of June, 1937, when he procured the execution of this note by the defendant, a stockholder in the bank, payable to said bank, negotiable in character, and due December 12, 1937. As we have previously indicated, the defendant signed the note, induced by the fraudulent representations of the said Irvin. The note was entirely regular upon its face, and was placed among the assets of the bank. The First National Bank of Albertville became embarrassed, largely due to the defalcation of one Smith, its vice-president and cashier. Some of the unfortunate history of this bank is disclosed in the case of Waldrop v. Martin, 237 Ala. 556, 188 So. 59. But nothing there decided is of interest here.

The deposits of the bank were insured by the Federal Deposit Insurance Company, and one of the representatives of this corporation, together with the Chief National Bank Examiner for the Comptroller's office, on August 10th, 1937, called Cottingham, the president of the Tennessee Valley Bank, informing him that there was some trouble at this bank at Albertville, and inquiring whether or not the Tennessee Valley Bank would be interested in purchasing the assets and assuming the depositers' liability. The defalcation amounted to some $90,000. Cottingham agreed to consider the matter. Later they called again. In the meanwhile, Smith had been placed under arrest, and newspaper publicity was being given to the defalcation, all of which resulted in a hurried agreement that the Tennessee Valley Bank would take over such assets as were acceptable and the Federal Deposit Insurance Company would advance the remainder of cash necessary to keep the bank in a going condition, protect the depositors, and prevent any run on the bank. Accordingly, Cottingham, the president, Adams, the vice-president, of the Tennessee Valley Bank, remained with others (among them direc-

tors who passed approving resolution) at the First National Bank of Albertville during the night of August 11th, taking over acceptable assets to the amount of $260,000, with $140,000 being advanced by the Federal Deposit Insurance Company. Among the assets taken over was this note.

As has been observed, they paid for this note its full face value with interest. The evidence is without dispute nothing was heard or said which in any manner would cause anyone to question the validity of this note. Defendant, whose financial statement was on file, was considered entirely responsible from a financial standpoint for the amount of this note. Counsel for defendant lay some stress upon the fact that these transactions occurred during the night but the evidence is without dispute there was nothing unusual in this, especially when one bank is taking over the assets of another in order to prevent a run. Indeed, the courts might take judicial knowledge of the fact there could be no suspicion attached upon this ground.

■ It appears that Irvin, the president of the Albertville bank was sick and had not been at the bank for some weeks. Counsel lay some stress upon the fact that the officials of the Tennessee Valley Bank made no effort to communicate with Irvin by the telephone which was nearby. But there was no occasion for any such communication. There was no fact brought to the knowledge of plaintiff bank indicating any fraudulent representation as to this note or that would cast any suspicion upon it. There it was in the bank among its assets, entirely regular upon its face. Plaintiff bank was under no legal obligation, therefore, to make inquiry of the maker. Wildsmith v. Tracy, 80 Ala. 258. Indeed, the record clearly indicates that at the time of the purchase of this note by the plaintiff bank, the defendant himself was unaware that he had been made the victim of any fraudulent representations. As was well observed by this Court in Bank of East Chattanooga v. Clayton, 206 Ala. 518, 90 So. 899: "To require an indorsee of negotiable paper to investigate such matters of bad faith would be to repudiate a basic principle of the law merchant, and to render futile its primary purpose, viz. to facilitate the use of instruments of credit in the business of the country." Smith, the vice-president and cashier, was present and made full admission of his defalcation. He admitted that some four of the notes that were in the

bank were what are called "dummy notes," which are different from forged notes. But the testimony shows that Smith was making a clean breast of the entire matter, and in any event, there was no question as to the genuineness of the note here sued upon.

Cottingham's testimony also clearly demonstrates that inquiry as to the maker of each note purchased was a practical impossibility under the circumstances, and indeed, as we have just observed, the law placed no such burden upon the purchasing bank. It is clear enough, therefore, thus far all the proof tends to show a transaction in entire good faith with no element of fraud, or even any suspicious circumstances. It was simply a business transaction into which the Tennessee Valley Bank had been invited by the agents of the Federal Government in order to meet an embarrassing situation in banking circles.

■ It appears that sometime afterwards—the exact date not being shown—this defendant instituted some character of suit in the equity court to which the plaintiff bank was made a party, seeking, as we understand it, a cancellation of this note. Defendant offered as a witness one Dalrimple, who testified that in July, 1938, nearly a year after the purchase of this note by the plaintiff bank, and when testimony was being taken in the equity case, he heard Cottingham, on the streets of Guntersville in conversation with some gentleman, unknown to the witness, make the following remark: "I was a little afraid of that Williams note from the beginning." Cottingham, of course, denied any such statement. But upon the question of the affirmative charge, the testimony of Dalrimple is taken for full face value. So accepted, we do not consider that it sufficed for the submission of the question of bad faith for the jury's consideration. What could be the meaning of any such expression is a matter of much doubt. Did it mean that he questioned the reliability or responsibility of the maker; or that he considered him of a litigous disposition; or that he might try to evade and avoid payment; or that he might make a shift of his property to avoid collection? The statement showed, at most, a mere suspicion of this note, and it is held by all the authorities that a mere suspicion of infirmity in a negotiable instrument does not suffice to establish bad faith. To be effective, there must be a knowledge of suspicious circumstances so

strong and obvious that to remain passive and ignore them would amount to willful ignorance, and of consequence, a participation in the fraud.

Applying the principle of the law here controlling, we are persuaded the proof wholly insufficient from which the jury could reasonably infer any bad faith in the purchase of this negotiable instrument, and that any other conclusion would rest upon a mere conjecture or speculation, which, as often here declared, is an insufficient basis for the foundation of a verdict. Southern Ry. Co. v. Miller, 226 Ala. 366, 147 So. 149; Georgia Power Co. v. Edmunds, 233 Ala. 273, 171 So. 256.

There being no evidence from which a reasonable inference of bad faith could be drawn, the plaintiff was entitled to the affirmative charge as duly requested, and its refusal was error to reverse. Reliance Equipment Co. v. Sherman, supra; Forbes v. First National Bank, supra. For the error indicated let the judgment stand reversed.

Reversed and remanded.

BOULDIN, FOSTER, and LAWSON, JJ., concur.